

# ARKANSAS COURT OF APPEALS
## DIVISION III
No. CV-17-3

| | |
|---|---|
| ALICIA VEST (NOW BUFORD) | Opinion Delivered: October 18, 2017 |
| APPELLANT | APPEAL FROM THE FRANKLIN COUNTY CIRCUIT COURT, NORTHERN DISTRICT [NO. 24ODR-08-48] |
| V. | |
| CORY VEST | |
| APPELLEE | HONORABLE DENNIS CHARLES SUTTERFIELD, JUDGE |
| | AFFIRMED |

**DAVID M. GLOVER, Judge**

Alicia (Vest) Buford and Cory Vest were divorced by decree entered on September 16, 2008. Alicia was awarded custody of their two children, K.V. and C.V., in part because Cory was dealing with a serious alcohol problem. Both parties have subsequently remarried. Cory's successful efforts to overcome his alcohol problem have resulted in changes to his visitation over the years, giving him more, and unsupervised, time with the children. On March 11, 2015, Cory filed a motion to modify custody. Following a hearing, the trial court found a material change in circumstances had occurred, and it was in the children's best interests to change custody from Alicia to Cory. The order changing custody was originally entered August 18, 2016, and then amended by order entered September 19, 2016. This appeal followed. We affirm.

The primary consideration in child-custody cases is the welfare and best interest of the children, and all other considerations are secondary. *Earl v. Earl*, 2015 Ark. App. 663, 476 S.W.3d 206. In order to change custody, the trial court must first determine that a material change in circumstances has occurred since the last order of custody. *Id.* The party seeking modification of the custody order has the burden of demonstrating a material change in circumstances. *Id.* If that threshold requirement is met, the trial court must then determine who should have custody, with the sole consideration being the best interest of the children. *Id.* Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody because the courts want to promote stability and continuity in the children's lives and to discourage repeated litigation of the same issues. *Id.*

When Alicia and Cory divorced in September 2008 and Alicia was awarded custody, K.V. was five years old and C.V. was three years old. At the time of the 2016 change-in-custody order, K.V. was thirteen and C.V. was almost eleven. There is no serious dispute that Cory currently has his alcoholism under control, so that was not a compelling issue in this case.

K.V. was diagnosed with type 1 diabetes after her parents divorced. She testified she wanted to live at her dad's house because it was "easier" and "not as stressful." She explained she liked living with her mom, but it was more stressful because she had to take care of her diabetes by herself, and her mom would sometimes panic if anything went wrong or if they did not understand something. She said it scared her when her mom did that, and it made her think she had done something wrong. She stated it was different at her dad's house because he helped her with her diabetes; he did not panic if they did not understand

something about it; he did not make her feel as if it were her fault; and if he could not figure out what to do, he would call the doctor and not make a big deal about it. She stated she feels safer at her dad's house, and she is much calmer and less nervous at her dad's house. She explained that her blood sugar "will do weird things" about two or three times a month; that it depends on whether she's nervous about something, like school tests, or if she's had big meals; that her mom panics and gets mad about it and explodes and yells and screams; and that it scares her when those situations arise. K.V. acknowledged her mom's "explosions" happened more often after her mom's sister, Julie, died, but it still happened sometimes, and it made her blood sugar spike and "made everything worse." She testified it was very important to her to live at her dad's house, and she was more comfortable and not scared there.

K.V. explained the intricacies of monitoring her diabetes. She also testified she loves her brother and wants to be with him no matter what decision the trial court made. She acknowledged she would have to change schools if she moved to her dad's house; stated she was used to it because she had changed schools three times in four years; and reported she makes all As. She said she would feel more relaxed at her dad's house because the stress of the responsibility of her diabetes would not be all on her, and she would not have to worry so much.

K.V. said the only downside she could think of if she moved to her dad's house was her mom's reaction; that her mom got really mad and withdrew from her when she was with her dad on weekends. She explained she was the one who pushed for a change of custody, but when she tells her mom she wants to live with her dad, her mom explodes,

screaming and yelling and trying to make her feel guilty for wanting to live at his house; her mom sees it as a betrayal; her mom does not like it when she tries to talk about her visits with her dad; and her mom "talks ugly" about her dad. She said her dad's house is more open, and they let her talk about what she does at her mom's house. K.V. denied she was exaggerating things in order to go live with her dad. She acknowledged that both of her parents love her and that they were both trying to do what the doctor told them to do about her diabetes.

C.V. also testified at the hearing, explaining he is in the fifth grade; he had gone to three schools and lived in at least three houses; he makes good grades; he leaves for school around 6:45 a.m. and is there until 4:00 or 4:30 in the afternoon while his mom finishes her work; he helps with chores at both his mom's and his dad's houses; he loves both of his parents and doesn't really have an opinion about where he wants to live; he doesn't want to hurt anyone's feelings and would be happy either place; and the most important thing to him was to stay where his sister is.

Cory testified at length about K.V.'s diabetes diagnosis and the training they received to deal with it. He explained the routines they follow at his house to monitor and control her blood sugar and how he allows her to calculate her carbs and ratios but that he then double-checks her calculations and makes any necessary corrections. He stated they work on it together and K.V. seems to appreciate his involvement.

Cory stated the first time K.V. asked him to seek a change in custody, he told her no but promised he would reconsider in six months if she still felt the same. He explained he wanted to make sure the reasons for a change were not superficial. He stated his biggest

issue was K.V.'s health, and he had concerns about the children's schedules at Alicia's house because diabetes needs consistency and a schedule. He acknowledged that K.V.'s doctor had reported that her diabetes was being well controlled, but he still believed he could do a better job than Alicia in helping K.V. control her diabetes.

Cory stated he and Alicia did not communicate well. He discussed his frustration that his requests for extra time with the children, backup supplies for K.V.'s diabetic needs, and requests to be notified about school and extracurricular activities had been ignored by Alicia. He candidly acknowledged he could do a better job of communicating with Alicia, stated that he had tried continuously to improve, and stated that Alicia had improved in the last six months.

Alicia testified she was currently teaching pre-K, and she had been a teacher for a total of fifteen years. She explained that she and Justin, her husband, also have a two-year-old child together, and all three children are very close. She stated that she and her husband have a combined income of approximately $140,000 to $150,000 a year; that they were financially able to care for the children; and that they planned to build a new house, but the house would be close to where they were currently living and the children would not have to change schools. She explained that, depending on traffic, it took about thirty to thirty-five minutes to drive the children to school but they had never complained about the drive. She described their daily routine, which usually begins early and ends some nights as late as 9:30, and some nights around 5:30. She acknowledged she has moved three times since she was awarded custody of the children. She confirmed earlier testimony that both children excel in school.

Alicia explained in detail the things she does to help K.V. manage her diabetes and described the types of things that could affect her blood sugar. She denied ever freaking out or getting upset with K.V. about her blood-sugar levels being too high or too low. She described her relationship with K.V. as a typical mother-daughter relationship; that it is a good relationship; that they had only one or two arguments in the last year; that she does not scream or yell at K.V.; and that she also has a good relationship with C.V. Alicia denied getting upset with K.V. when K.V. told her she wanted to live with her dad and when she asked K.V. why she wanted to live with her dad, K.V. did not really have a reason. Alicia acknowledged she has K.V. do a lot of the work herself in calculating her blood-sugar levels; she monitors K.V.'s calculations but wants her to do it on her own because she is going to have to live with the disease for the rest of her life; Alicia could not be with her "24/7"; and K.V. does a great job for a thirteen-year-old. Alicia stated they eat out a couple of times a week, and the rest of the time they eat at home.

Alicia denied that she had refused to give information about the children to Cory. She outlined the children's activities, which included dance classes, dance competitions, cheerleading, and band for K.V. and basketball and baseball for C.V. Alicia described the manner in which she communicates with Cory, explaining she did not always respond immediately because she was either teaching or wanted to discuss it with her husband. She stated Justin gets along well with the children; they really like him; and, except for one or two times, she and Justin do not argue or yell or scream at each other in front of the kids. She stated she did not think it was in the children's best interest to change custody to Cory because "he doesn't work, he manipulates and lies quite often"; that she would be concerned

about the influence and character traits they would be taught. She acknowledged that Cory would take care of K.V.'s medical needs. She stated it was "hard and hurtful" to her that K.V. wanted to live with her dad; she did not think K.V.'s opinion should be given any weight because she believed K.V. had been "coached and bribed" with promises she would get to cheer, dance, and "paint a mustang any color she wanted." Alicia stated that in the time since the divorce, the children's home life has gotten better, not worse, and there was no change in the situation that's gotten worse at all. Alicia acknowledged that two of the children's three school changes could have been prevented if they had gone to the schools in the district where they lived (Hulbert School District) but stated she would not send the children to that district because its state report card was not good.

Two other witnesses testified, Tina Smith, who is Cory's sister, and Justin Buford, who is Alicia's husband. Tina testified she worked twenty-three years in public schools; the children do well with Cory; she finds K.V. to be credible; she is a very mature thirteen-year-old; in her opinion, the longer a child's travel time, the more tired he or she is at school; and she believed Cory would foster a good relationship with Alicia. Justin testified he, K.V., and C.V. have fun together; he has observed Alicia taking care of K.V.'s medical issues, and she does a good job; he and Alicia get along really well; they do not yell and scream at each other, and in the last year and a half, he has not seen Alicia and K.V. yelling or screaming at each other; Alicia may raise her voice, but she is a great mom and takes care of every need the children have; and he wants the children to live in their house.

In reviewing child-custody cases, we consider the evidence de novo but will not reverse a trial court's findings unless they are clearly erroneous or clearly against the

preponderance of the evidence. *Montez v. Montez*, 2017 Ark. App. 220, 518 S.W.3d 751. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Id.* We recognize and give special deference to the superior position of a trial court to evaluate the witnesses, their testimony, and the child's best interest. *Id.* There are no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carries a greater weight than those involving children. *Acre v. Tullis*, 2017 Ark. App. 249, 520 S.W.3d 316.

For ease of discussion, we address Alicia's last point first. In it, she contends that at the time Cory filed his March 11, 2015 motion to change custody, it had been less than four months since the last custody modification had been made. We disagree. As noted by the trial court in its letter opinion, custody was established in the 2008 divorce decree and that was the last time custody had been litigated. In her reply brief to this court, Alicia acknowledges that subsequent motions filed by Cory "were not labeled specifically with the label of custody," but that "the spirit and intent of both such motions included language and tone suggesting modification beyond simply visitation." We find no clear error in the trial court's determination that subsequent modification orders dealt with visitation, not custody, and that the last time custody of the children was litigated was in 2008.

Alicia's four remaining points of appeal address her overall contention the trial court clearly erred in finding that a material change in circumstances had occurred and that it was in the children's best interests to change custody to Cory. She contends 1) there was no material change of circumstances in her home and/or none that negatively affected the

children's best interests; 2) K.V.'s diabetes diagnosis, which occurred five years earlier and

for which both parties had been adequately trained to handle, did not indicate a material

change in circumstances and Alicia had handled the treatment alone for a substantial portion

of that five-year period; 3) there were no substantial changes in circumstances affecting the

children's best interests that were not known or not presented to the trial court prior to the

initial custody determination; and 4) without any evidence of a material change in

circumstances, K.V.'s preference, standing alone, was not sufficient to support a material

change in circumstances.

The trial court explained its reasons for changing custody to Cory in a lengthy letter

opinion, which provided in part:

> The court finds that there have been material changes in circumstances which warrant re-evaluation of custody in this case. First, there has been the passage of time since the last meaningful review of custody took place. During that time the relationships of the parties and children have seen many changes. Both parties have remarried. Mr. Vest has re-established his contact and significant involvement with the minor children and made substantial personal improvements. In addition to these changes both minor children have now reached an age and level of maturity to warrant a serious consideration of their preferences in regard to custody.
> . . . .
> Another change in circumstances is the fact that the oldest child, K.V., was diagnosed with diabetes five years ago and the child has had to undergo important lifestyle changes and deal with this condition on a daily basis. This disease demands the constant attention of K.V. and her parents.

While the trial court recognized that both parents were capable of assisting and

helping K.V. monitor her diabetes, he specifically found that K.V. had greater confidence

in her father than her mother in working on controlling her diabetes. The trial court

specifically found both homes were stable with a good financial standard of living and good

physical living conditions. It further found the school system that would be involved in the

change of custody from Alicia to Cory is a good one and specifically found the children being in closer proximity to the school they would attend was an advantage in favor of a change of custody. Still further, the trial court found that Alicia "intensely dislikes" Cory, manifesting "an open disdain" for him, but the children were "extremely happy that their relationship with their father has been renewed." The trial court recognized the stability and positive influence Alicia had provided for K.V. and C.V. and how much she loves them, but concluded she had mixed her view of what needed to be done to protect the children with her disdain and hostility toward Cory, creating a poisonous situation that was damaging her relationship with her children. The court concluded Alicia strongly disagreed with the court's orders that had allowed Cory's involvement in the children's lives and that she would not voluntarily take any steps whatsoever to foster their relationship with Cory. The trial court noted that a child's preference is not dispositive in a custody case, but that as children grow older and more mature their preferences should be seriously considered. The court recounted that C.V. did not express a strong preference regarding custody, but he did express a strong desire not to be separated from K.V. and that K.V.'s very strong and clear preference was to live at her dad's house.

The trial court found that based on the totality of the evidence presented to it, material changes in circumstances had taken place since custody was first awarded to Alicia with the 2008 divorce decree, and it was in the children's best interests to change custody to Cory. Our de novo review of the record does not leave us with a definite and firm conviction that the trial court made a mistake.

Despite Alicia's arguments to the contrary, the changes did not all occur with Cory as the noncustodial parent. In addition to Cory's remarriage and gaining control of his alcoholism (which would not justify a change of custody standing alone, but was properly considered by the trial court, *see*, *e.g.*, *Harral v. McGaha*, 2013 Ark. App. 320, 427 S.W.3d 769), Alicia had also remarried since the original divorce decree; she had moved three times, with three school changes for the kids and was at least contemplating a fourth move; and the children's resulting commute time was a concern to the trial court, along with Alicia's open disdain for Cory. The primary change in circumstances, however, was that K.V. had developed diabetes. Alicia discounts the diabetes diagnosis because it occurred five years earlier. We disagree. Even though the diagnosis had occurred much earlier, the disease required major lifestyle changes and daily monitoring and treatment. Both families' efforts to help K.V. deal with the diagnosis constituted a major portion of the testimony presented. We noted in an earlier case that in some instances it may be the adverse impact on a child that makes a change in circumstances "material." *Valentine v. Valentine*, 2010 Ark. App. 259, 377 S.W.3d 387. The trial court determined the changes resulting from the diabetes diagnosis, along with others, constituted a material change in circumstances, and we see no clear error in that finding.

Neither do we find clear error in the trial court's determination that changing custody to Cory was in the children's best interests. Some of the factors a trial court may consider in determining best interest include the psychological relationship between the parents and the child, the need for stability and continuity in the relationship between parents and the child, the past conduct of the parents toward the child, and the reasonable

preference of the child. *Westin v. Hays*, 2017 Ark. App. 128, 513 S.W.3d 900. Here, K.V.'s strong preference to live with her dad was not the trial court's sole consideration, but it was given considerable weight. In expressing her preference, K.V.'s description of her life in her mother's household demonstrated that she regarded it as more chaotic and less stable, causing her more stress than she experienced at her father's house, which she described as more calm. K.V. explained that stress was one of the factors that could cause her blood-sugar levels to get out of line. In addition, K.V. expressed more confidence in the way her father dealt with her diabetes—being more of a partner with her in addressing her medical needs and not as prone to panic when things went wrong. She also expressed her fear that Alicia would alienate herself from K.V. because of her desire to live with her father. The trial court found that Alicia's disdain for Cory, as well as their history, was negatively impacting her relationship with the children, and Cory was more likely to foster the relationship between Alicia and the children. C.V.'s clear preference is to go where K.V. goes. We are not convinced the trial court made a mistake in finding that it was in the children's best interests to change custody to their father.

Affirmed.

VIRDEN and MURPHY, JJ., agree.

*Kevin L. Hickey*, for appellant.

*Aubrey L. Barr*, for appellee.