Cite as 2020 Ark. App. 258

# ARKANSAS COURT OF APPEALS
DIVISION I
**No.** CV-19-797

| | | | |
|---|---|---|---|
| BRITTANY PELAYO | | **Opinion Delivered:** April 22, 2020 | |
| | APPELLANT | APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, GREEWOOD DISTRICT [NO. 66GDR–18–2596] | |
| V. | | | |
| WESLEY SIMS | | HONORABLE SHANNON L. BLATT, JUDGE | |
| | APPELLEE | AFFIRMED | |

## MEREDITH B. SWITZER, Judge

Brittany Pelayo and Wesley Sims are the biological parents of T.W.S. Brittany appeals from the June 19, 2019 order that awarded custody of T.W.S. to Wesley and allowed Wesley to move T.W.S. to Oklahoma. She raises nine points, most of which challenge the circuit court's findings regarding Wesley's care and support of T.W.S., Wesley's stability, Brittany's instability, T.W.S.'s best interest, and allowing Wesley to move T.W.S. to Oklahoma. She further contends that the circuit court did not give due consideration to the sibling relationship or to the attorney ad litem's recommendation and that it did not apply the correct statute in awarding back-due child support. Finally, she contends the circuit court erred in denying her posttrial motions. We affirm.

### I. *Background*

Brittany and Wesley never married, but they lived together until three months before T.W.S. was born. Brittany left at that time because she found the living arrangements to

be "intolerable." According to Brittany, she and Wesley had a DNA test performed when T.W.S. was born, which established Wesley as the father. Wesley lives in Oklahoma; Brittany lives in Arkansas.

On November 20, 2018, Wesley Sims filed a complaint for paternity and custody. Brittany answered. By order entered on February 13, 2019, the circuit court appointed an attorney ad litem for T.W.S. On March 27, Brittany filed a motion to relocate outside Arkansas. She explained in her motion that she is married to a member of the armed forces who is in the drill-instructor program and stationed at Paris, Island, South Carolina; that she had researched schools and pediatricians in the area and found suitable options; and that it would be financially beneficial to the family to relocate and reside in one household.

T.W.S. was seven years old at the time of the May 22 hearing on the motions. Brittany explained that she has another son, B., who is about five years older than T.W.S. She explained that she and her wife, Michelle Cox, began their relationship after she broke up with Kieren Cragle (formerly L. Cragle) in October, and they were engaged on November 10; B. and T.W.S. met Michelle around November 12 or 14; and she and Michelle were married on December 26, 2018. She testified that prior to Michelle, she had been in an almost two-year relationship with Kieren; that during that time, Kieren was in the process of transitioning from male to female; that the relationship terminated on October 19 or 20, 2018, because Brittany asserted that Kieren was manipulative and controlling and their fights had become physical—resulting in Kieren's being arrested.

Brittany stated that she and a friend had gone to Florida in the aftermath of the altercation with Kieren, and she ended her relationship with Kieren by telephone the second

2

night she was there. She met Michelle while in Florida through mutual friends. She stated that Kieren is "a good person, a good parent, helped [her] take care [of her sons], and loved them" but that it was the way Kieren treated her that caused her to end the relationship.

Brittany explained that T.W.S. went to preschool in Charleston, Arkansas, attended kindergarten at Euper Lane, and was currently in first grade at Westwood in the Greenwood School District in Fort Smith. She said she moved the boys from Euper Lane because B. was getting bullied, but they were both "doing great now." She said she was planning and preparing to move to South Carolina so they could be a family with Michelle. She explained her work history, which consisted of three jobs and a period of being a stay-at-home mom since T.W.S.'s birth. She acknowledged she had been convicted of shoplifting and fraudulent use of a credit card when she was living with Wesley and couldn't buy food. She has a speeding ticket and she accidentally rear-ended somebody "a few years ago," but "the other citations have been dropped."

Brittany acknowledged that she does not have any complaints about Wesley's parenting. She explained that T.W.S. sometimes chooses a dress and pink shoes to wear, along with other choices, and that she buys him dolls, purses, and wallets if he asks. She tries to encourage him to be himself and be strong, but she does not believe she has influenced his choices. She explained that T.W.S. was five when he met Kieren and that he had liked those things before meeting Kieren.

She testified she hoped to go back to school in South Carolina to be a licensed health and wellness coach. She explained that there were many programs available to start a business through the military, that she planned to stay home and help the boys' transition

3

through the move, and that she would work part time while they were at school and attend her school in the evenings. She has no other family in South Carolina, and most of T.W.S.'s family live in Oklahoma and Arkansas. She agreed that it is important for T.W.S. to be close to Wesley's family and explained that the South Carolina house has extra rooms for guests. She said that she is open to all kinds of visitation if she is allowed to move and "given custody." She stated that Wesley had never tried to get visitation; that she encouraged it every other weekend; that she has not tried to keep T.W.S. from Wesley; that would not change with a move; that Wesley does not currently call T.W.S.; and that she would not ordinarily object to Wesley's request to take T.W.S. on vacation to Glacier National Park in the coming summer, but for that summer she wanted T.W.S. to be able to get adjusted to his new house and surroundings. She said she did not personally know about South Carolina but had studied it.

Brittany explained that Michelle is a sergeant in the Marine Corps drill–instructor school. She said that only two women have been picked for the position held by Michelle and that her orders are to be there for three years. Brittany testified that Michelle is very close to T.W.S. and B., that she calls every day and video chats with them, and that she is very loving and nurturing.

Brittany testified about the relationship between B. and T.W.S.. She said that B. is a hero to T.W.S.; T.W.S. wants to do everything like B.; they are so excited to be back together after weekends with their dads; they play together all the time; they have sibling arguments and T.W.S. sometimes annoys B. and B. can be bossy, but they are very close; and it "would kill the boys" if they were separated.

4

She said that for the first year of T.W.S.'s life, Wesley did not spend much time with him because Wesley lived in Oklahoma. Wesley would come see T.W.S. every week or two weeks, and she would also take T.W.S. to see Wesley's dad. Wesley did not ask, and she would not have allowed overnights that first year, but after that there were overnight visits, and for "the last couple of years it's been about every other weekend." She explained that Wesley had only once kept T.W.S. for more than fifteen days, and that was during last year's vacation trip. She said they were supposed to be gone only ten days; they were in "the Redwoods" and a call from her upset T.W.S. when he heard her voice. She then texted instead but Wesley would not respond for three to four days.

Brittany explained that after the physical altercation with Kieren, she took B. and T.W.S. and went to a safe place. She then went to the doctor, the schools, and the police station. Charges were filed against Kieren and a no-contact order and order of protection were entered.

She testified that she tried twice to establish Wesley's paternity through a child-support case, but she did not have enough information; that Wesley would not share his information with her to apply for child support, and she did not know his social security number or his mailing address; that "a few years later, he started paying more regularly"; that he was paying seventy-five dollars every two weeks; and that "it's been regular the past year to two years." She explained that the misdemeanor shoplifting and credit-card convictions happened before T.W.S. was born. She said that Wesley went to one preschool program, but no gymnastics or kindergarten graduation; that he did not call between visits;

that he came to three or four soccer games; and had never taken him to the doctor, the dentist, or school.

If allowed to move, Brittany said the family would live in Beaufort, South Carolina, near Paris Island. She explained that they had found a house and expected to close on it on June 3. She has read everything about the elementary and middle schools in the area. T.W.S. would go to Lady's Island Elementary, an art-based elementary, in Beaufort County, about twenty minutes from the new house. Brittany explained that T.W.S. loves to sing so it is a good learning environment for him. She was able to access the school calendar and highlighted the times T.W.S. would be out of school and able to visit Wesley. She said she had researched extracurricular activities and churches, and Michelle found a church just four minutes from the new house.

She said that she would notify Wesley when T.W.S. was sick or if they were at the emergency room, and although she did not invite him to go, he could have come. She said that she did not consult a psychologist when she and Kieren talked to T.W.S. about the transitioning process but that their family therapist knew about it and "thought everything they did was good."

Wesley testified that he is T.W.S.'s father and that he wants T.W.S. to live with him and his family in Oklahoma. He explained that although he had lived rent-free with his father most of his life, he was building a house for him and T.W.S. to live in; that his relationship with T.W.S. is "great"; and that he loves his son, who has always been a big part of Wesley's family. Wesley stated that he and T.W.S. canoe and ride four-wheelers, that T.W.S. visits with his cousin, that he and T.W.S. camp and drive around, and that they

go to national parks on vacation. He learned from T.W.S. that Kieren was taking drugs to transition, and he was upset Brittany did not tell him. Wesley said he thinks Brittany forces her choices and lifestyle on T.W.S., and T.W.S. wants to make her proud. He said T.W.S. doesn't wear dresses at Wesley's house nor does he wear pink shoes or play with dolls. Wesley thinks Brittany's lifestyle is confusing to T.W.S., and he does not agree with her having multiple partners during such short periods of time, no matter her sexual orientation. He does not believe it was appropriate how fast she met, married, and planned to move with Michelle.

Wesley's father, two aunts, and brother live near him in Oklahoma, and T.W.S. is close to his grandfather. T.W.S. also likes spending time at his aunts' houses. Wesley's new house is only ten minutes from these family members. It is two minutes from Liberty Elementary. Wesley has worked for the Fort Smith Fire Department for four and a half years. He takes home $1200 every two weeks. He said he has been preparing a good home, family, and school for T.W.S.. He explained that he is motivated to seek custody of T.W.S. because he believes conditions with Brittany are getting worse. He said he is willing to give Brittany as much visitation as possible, and he does not have a problem with her celebrating Christmas and Easter with T.W.S. because his family does not celebrate those holidays. He would also facilitate travel. Wesley described himself as a "good guy, good dad and [he wants] the best for his son." He said he had never been convicted of a crime, has a clean driving record, works one day on and two days off, and every third weekend he has a full weekend off. His family will watch T.W.S. while he works. His aunt teaches school and can keep T.W.S. when school is closed.

7

Wesley acknowledged that T.W.S. was seven years old, and this was the first time he had been to court concerning T.W.S. He also acknowledged that Brittany had "mostly" been a good mom. He was concerned, however, that she was moving people in and out and had gotten in a fight in front of T.W.S. He said he does not care that Brittany is gay or that she married a woman, but he did not like her explaining sex changes to T.W.S. at such a young age. Wesley said he is not married; he stated he is in a relationship but does not live with the woman. He said he does not communicate well with Brittany. He believes Brittany takes T.W.S. to the doctor for "minor stuff," and he thinks antibiotics harm the immune system—so there have been disagreements about the use of prescribed medications for T.W.S..

William Sims, Wesley's father and T.W.S.'s grandfather, testified that Wesley is a "great dad," and he worries for T.W.S. if Wesley isn't there. Carol Henson, Wesley's aunt, testified that Wesley is an excellent dad and that T.W.S. is a great kid. She said Wesley's new house will be a good place for T.W.S. to live, and she thought it would be a mistake to take T.W.S. to South Carolina. She acknowledged that T.W.S. loves his mom. Judy Pierce, Brittany's grandmother, testified. She said Brittany is very close to T.W.S. and B. and had always done the best she could to care for them. She said she thought it would destroy B. to take T.W.S. from him and it would be hard on T.W.S., too. She said she had met Michelle; she seemed like a very good person, and she got along with the boys.

The ad litem reported that both Wesley and Brittany are fine people and fit parents. She said that T.W.S. loves his parents and extended family, that he is a happy child, and that Wesley is a great dad. She was concerned that Wesley had waited six years before filing for

8

paternity but that he tries to be a good dad and his schedule allows flexibility.  She testified that Brittany is a "really good mom," and that it would be devastating to take T.W.S. from his mom and brother.  Her recommendation was that T.W.S. stay with Brittany and move to South Carolina.

At the conclusion of the hearing, the circuit court ruled from the bench that Wesley is the father, that he should be awarded custody, and that it would not be in T.W.S.'s best interest to be moved.  The court ordered standard visitation for Brittany, as the noncustodial parent, and granted permission for T.W.S. to relocate to Oklahoma.  Wesley was ordered to pay Brittany $216 every two weeks for the period beginning the first Friday after November 20, 2018 (when Wesley filed the paternity/custody petition), until Friday, May 25, 2019 (when the custody order was to take effect).  Brittany was ordered to pay Wesley seventy-two dollars a week beginning May 25.

## II. *Discussion*

The custody award in this case is the initial custody decision regarding T.W.S. because there was no earlier action involving him.  *See Rivers v. DeBoer*, 2019 Ark. App. 132, 572 S.W.3d 887.  Initial custody decisions do not require a change of circumstances. *Id*.  Instead, Arkansas Code Annotated section 9-10-113 (Repl. 2015) provides in pertinent part:

> (a) When a child is born to an unmarried woman, legal custody of that child shall be in the woman giving birth to the child until the child reaches eighteen (18) years of age unless a court of competent jurisdiction enters an order placing the child in the custody of another party.
>
> (b) A biological father, provided he has established paternity in a court of competent jurisdiction, may petition the circuit court in the county where the child resides for custody of the child.

9

(c) The court may award custody to the biological father upon a showing that:
　　(1) He is a fit parent to raise the child;
　　(2) He has assumed his responsibilities toward the child by providing care, supervision, protection, and financial support for the child; and
　　(3) It is in the best interest of the child to award custody to the biological father.

The June 19, 2019 order awarding custody to Wesley provides:

3. After hearing the testimony of the parties and witnesses the Court finds that the Plaintiff has established a more stable environment for the minor child as evidenced by him living in the same location and having the same job for an extended period of time. The Court finds that the Defendant mother has exhibited a pattern of instability including multiple moves over the past several years. Further, the Defendant ended a relationship in October of 2018, immediately beginning a new relationship in October of 2018 which led to the Defendant's engagement on November 10, 2018. The Defendant introduced her new partner to the minor children on November 12, 2018, and had her new fiancé stay in the home for a period of time in November of 2018. The Defendant then married her new partner in December and subsequently filed a petition in this Court asking to remove the parties' minor child to South Carolina where her partner is stationed.

4. The Court finds that most of the child's extended family lives in the Western Arkansas/Eastern Oklahoma River Valley.

5. The Court finds that it is in the best interest of the minor child that the Plaintiff be awarded custody of the minor child with the Defendant to receive visitation pursuant to this Court's Standard Order Regarding Child Visitation and Related Matters.

As mentioned previously, the majority of Brittany's nine points challenge the circuit court's findings supporting its award of custody to Wesley. She asserts error in the circuit court's findings regarding Wesley's care and support of T.W.S., Wesley's stability, Brittany's instability, T.W.S.'s best interest, and allowing Wesley to move T.W.S. to Oklahoma. For ease of discussion, these points will be addressed together.

In reviewing child-custody cases, we consider the evidence de novo but will not reverse a circuit court's findings unless they are clearly erroneous or clearly against the

10

preponderance of the evidence. *Vest v. Vest*, 2017 Ark. App. 530, 529 S.W.3d 703. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Id.* We recognize and give special deference to the superior position of a circuit court to evaluate the witnesses, their testimony, and the child's best interest. *Id.* There are no cases in which the superior position, ability, and opportunity of the circuit court to observe the parties carries a greater weight than those involving children. *Id.*

Brittany first argues that the evidence does not support the statutory requisites of section 9-10-113(c), particularly subsection (c)(2). We disagree. While Wesley has not been a model of parental responsibility, he did eventually provide some financial support, care, supervision, and protection for T.W.S. on a regular basis. For at least two years preceding the hearing, he gave Brittany seventy-five dollars every other week; he had visitation with Wesley every other weekend; and the evidence supports the conclusion that he provides appropriate care, supervision, and protection for T.W.S. when T.W.S. is in his care. In addition, while the circuit court did not make a specific finding of Wesley's fitness, we can assume that it found Wesley to be fit because it awarded custody to Wesley. In the absence of a showing to the contrary, we presume that the circuit court acted properly and made such findings of fact as were necessary to support its decision. *Chekuri v. Nekkalapudi*, 2020 Ark. 74, at 13–14, 593 S.W.3d 467, 475–76. Moreover, the evidence before the circuit court supports a fitness finding. We are not left with a definite and firm conviction that the circuit court made a mistake in concluding subsections (c)(1) and (2) were satisfied.

11

The remaining challenges fall generally within subsection (c)(3)'s best-interest requirement, and we find no clear error concerning them either. The evidence shows that there have been several significant changes in Brittany's life in a short period of time, while Wesley's job and living situation have been more consistent. The circuit court weighed the evidence and concluded that Wesley had provided a more stable environment for T.W.S. Weighing the evidence as the circuit court did, we find no clear error in the circuit court's determination that Wesley's life at this point is more stable. He has had the same job as a firefighter for several years. He has lived consistently in his father's house, where there is a dedicated bedroom for T.W.S. and where Wesley lived at the time of the hearing. Wesley was building his own house in the same vicinity, and it was almost completed. Wesley lives in the same overall vicinity as many members of his own family and within a relatively short distance from Brittany's extended family. There is also a good school for T.W.S. nearby.

Brittany argues that the circuit court did not give due consideration to the attorney ad litem's recommendation. We find no basis for reversal in her argument because a circuit court is not bound to follow an ad litem's recommendation. *Williams v. Williams*, 2019 Ark. App. 186, 575 S.W.3d 156. Moreover, as mentioned previously, there are no cases in which the superior position, ability, and opportunity of the circuit court to observe the parties carries a greater weight than those involving children. *Vest, supra*.

Brittany next argues that the circuit court did not apply the correct statute in awarding and calculating back-due child support. We cannot address this issue because it is being raised for the first time on appeal. Our law is well settled that issues raised for the first

12

time on appeal, even constitutional ones, will not be considered. *Tipton v. Aaron*, 87 Ark. App. 1, 185 S.W.3d 142 (2004).

Finally, Brittany contends that the circuit court erred in not granting her posttrial motion in which she moved for judgment notwithstanding the verdict; to amend the court's findings of fact or to make additional findings; or, in the alternative, for new trial. Although she lists several posttrial requests in the caption for this point, the focus of her actual argument is limited to Rule 59(a)(7) of the Arkansas Rules of Civil Procedure, which provides that

> [a] new trial may be granted to all or any of the parties and on all or part of the claim on the application of the party aggrieved, for any of the following grounds materially affecting the substantial rights of such party: . . . (7) newly discovered evidence material for the party applying, which he could not, with reasonable diligence, have discovered and produced at the trial.

Brittany contends that the newly discovered information she wants to present in a new trial would be presented by T.W.S.'s therapist and involves his changed behavior, most of which has occurred since custody was awarded to Wesley. This behavior includes "meltdowns, confusion, baby talk, worrying and crying." Newly discovered evidence is one of the least favored grounds to justify a new trial. *Piercy v. Wal-Mart Stores, Inc.*, 311 Ark. 424, 844 S.W.2d 337 (1993). The decision to grant or deny a motion for new trial based on newly discovered evidence lies within the circuit court's sound discretion. *Id.* We limit our review of this point to the argument actually developed on appeal, and all other arguments associated with this point have been abandoned.

In seeking a new trial on this basis, a party must demonstrate that (1) he or she could not with reasonable diligence have discovered and produced the evidence at the time of

13

trial, (2) the evidence is not merely impeaching or cumulative, and (3) the additional testimony would probably have changed the result of the trial. *Piercy*, *supra*. To the extent any of T.W.S.'s behaviors existed at the time of trial, reasonable diligence would have resulted in its discovery, and the therapist could have testified at trial. With respect to any behaviors that arose after custody was awarded to Wesley—which is the major thrust of her argument—a critical problem with Brittany's argument is that those behaviors do not constitute newly discovered evidence. The behaviors may be newly developed in that they did not exist at the time of the original custody hearing. They may reflect a change of circumstances from those that existed at the time of the hearing, but evidence of these behaviors does not constitute newly discovered evidence that would support a new trial. We find no abuse of discretion in the circuit court's denial of Brittany's motion for new trial.

Affirmed.

GLADWIN and MURPHY, JJ., agree.

*Wemar Law Office*, by: *DeeAnna Weimar*, for appellant.

*Walters, Gaston, Allison & Parker*, by: *Derick Allison*, for appellee.