2011 Ark. App. 18

**Kristen PARKER, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,**
**Appellee.**

**No. CA 10–746.**

Court of Appeals of Arkansas.

Jan. 12, 2011.

J. Brent Standridge, Benton, for appellant.

Melissa Bristow, Richardson, Jonesboro, Tabitha Baertels McNulty, Little Rock, for appellee.

JOSEPHINE LINKER HART, Judge.

This dependency-neglect case involves allegations that a mother subjected her eleven-month-old son to Munchausen Syndrome by Proxy. Appellant Kristen Parker challenges the sufficiency of the evidence to support the circuit court's determination that her son, M.P., who was born on November 26, 2008, was dependent-neglected.[1] We affirm.

The child was admitted to Arkansas Children's Hospital (ACH) on November 11, 2009, for fever, vomiting, and reduced oral intake, after being seen in the emergency room on two previous occasions for similar complaints. The staff at ACH alleged that appellant had tampered with M.P.'s intravenous line; reported symptoms that were inconsistent with the child's physical examinations; and requested the physicians to perform an en-

1. On November 4, 2010, the Arkansas Supreme Court denied appellee's motion to dismiss this appeal for deficiencies concerning the timeliness and form of the notices of appeal, and granted appellant's motion for belated appeal.

doscopic procedure on M.P. that they did not believe was needed. DHS filed a petition for emergency custody of M.P. in the Saline County Circuit Court on November 19, 2009, on the basis of the following affidavit:

b. On November 16, 2009, FSW was notified there were concerns that Munchausen Syndrome by Proxy may have taken place with [M.P.] The mother was observed tampering with the IV three times, it was out the first time, she was then told not to touch the IV again. The second time it was out and clamped in two places, she was told again to not touch the IV. The third time, IV monitoring alarm was silenced and a blue clamp was removed from under the tape and used to clamp off the IV; there was blood in the hub of the IV. The mother was observed reviewing the patient's red folder without aid for interpretation. The mother took the child's temperature rectally and asked was the temperature high enough for medication; she also requested a scope for the patient, because he has been throwing up since birth. She was also observed moving the bed to avoid being monitored. The mother also refused to speak to a social worker, saying that she was a nurse and knew about Munchausen's Syndrome by Proxy, when no one had ever mentioned that to her. On few different occasions, mother seemed to handle patient roughly, trying to force-feed his bottle, when patient was crying and turning his head away. There was contradictory history of feeding disorder and possible pediatric condition falsification, such as having a high fever, which was not to be true. Also the A/O was seen mixing liquid substance into patients' bottle while on restricted feeds. There were also other symptoms reported by mother that was [sic] not observed.

The circuit court entered an emergency custody order on November 19, 2009, and held a probable-cause hearing five days later. In the order finding probable cause, the court authorized supervised visitation for appellant.

Appellant attended the adjudication hearing held on February 11, 2009, with her attorney. Persons testifying at the hearing included appellant; Skye Adams, a social worker at ACH; Dr. Jerry Jones, a pediatrician at ACH who specializes in child-maltreatment evaluations; Dr. Laura Sisterhen, a pediatrician at ACH; Jessica Hamilton, a registered nurse at ACH; Christine Jeffrey, a registered nurse at ACH; Craig Jones, a social worker who has seen appellant at the direction of DHS; Roderick Rhodes, M.P.'s grandfather; Brooke Hobby, an LPN who is a close friend of appellant; and Dr. Chad Rodgers, M.P.'s primary-care physician.

Dr. Jones testified that Dr. Sisterhen asked him to consult with her and the hospital's team for at-risk children about her concerns that appellant was requesting potentially risky inappropriate or unneeded care for M.P. He stated that the concerns expressed at the conference were that appellant appeared highly anxious, making frequent telephone calls to Dr. Rodgers and the hospital's telephone helpline; that appellant appeared so stressed on one occasion that she had to leave the area and take a handful of pills; that appellant had reported that M.P. had not eaten or drunk much for two months, even though the child was at the ninety-fifth percentile for weight and height; that appellant had stated that she did not need a visit by a social worker because she fed her baby and knew about Munchausen by Proxy; that the high fevers that she had described were not present on prior visits; that she had asked for an unnecessary scope to be performed; that on two occa-

sions, the child's IV had been disconnected; that on one occasion, the IV had been clamped closed under a bandage; that appellant had falsified M.P.'s high fever and had wanted the IV fluids to be continued, even though it was not indicated; and that, on the 13th or 14th of November, the nurses reported that appellant had given something in a dropper to M.P. that had not been prescribed. He said that the team decided to conduct a period of close observation.

Dr. Jones stated that, after the conference, he met with appellant, who provided a history of the child's having eaten very well, which contradicted the history that she had given to the other physicians. He explained that this was of particular concern because physicians rely on parents to give an accurate history of the child's symptoms; if the history is not reliable, the physicians could perform procedures that are risky, that result in repeated or prolonged hospitalizations, and that could affect the child's physical and emotional development, especially considering the risk of acquiring an infection in the hospital. Dr. Jones stated that even a relatively routine procedure involves a certain amount of risk and that he considered a parent's clamping or disconnecting an IV to be very serious. He testified that the child did not need a scope and was, in fact, very well-developed and well-nourished. Dr. Jones opined that M.P. was a victim of child-maltreatment syndrome, specifically, pediatric condition falsification, which is a preferred term for Munchausen by Proxy. He also said that he did not believe that it was necessary for appellant to be given a psychological evaluation before he could conclude that this had occurred. He conceded that he had no evidence that appellant had actually made the child ill, but he believed that she had falsified M.P.'s condition. He added that she had also taken the child to Dr. Rodgers when there was nothing wrong with him. Dr. Jones acknowledged, however, that M.P. had suffered from a recent ear infection and may have had a fever; that M.P. had had tubes placed in his ears; that it is not unusual for a mother to be highly stressed and anxious when a young child has medical difficulties; and that appellant had previously lost a child.

Dr. Laura Sisterhen testified that M.P. was admitted to her care on November 11, 2009. She stated that M.P. had been seen in the emergency room on November 9 and 10 for complaints of fever, reduced oral intake, and decreased urine output; on the day of admission to the hospital for dehydration, appellant had stated that he had run a fever as high as 105 degrees. Under her care, she said, he was given intravenous fluids. Because M.P. developed a bloody discharge from one of his ears, and because appellant raised concerns about M.P.'s having choked on food, Dr. Sisterhen sought speech pathology and ear, nose, and throat consultations. Dr. Sisterhen said that appellant asked for a scope to see why M.P. was choking but did not tell her that the child had already been seen by an ear, nose, and throat specialist for ear infections the previous summer.

Dr. Sisterhen said that appellant's description of M.P.'s feeding history varied daily. Even though appellant had concerns about his not being able to eat solid food well or drink from a cup, he was observed at the hospital drinking from a cup and eating solid food without problems. Dr. Sisterhen said that, without a straight-forward history, it was hard to evaluate whether M.P. was at risk for aspiration but because of his lack of overt signs of obstruction or frequent aspiration, she did not believe that it was necessary for M.P.'s airways to be scoped. She testified that, throughout his hospitalization, M.P. looked like a well child; he was play-

ful, very alert, and active, even on the first day of his hospital stay. She said that when she talked to appellant about her observations, appellant replied that he was not having any urine output or eating or drinking. On the third day of the hospitalization, appellant told her in the morning that he had not had a wet diaper all night, but upon inspection, his diaper was soaking wet. Dr. Sisterhen said that M.P.'s temperature was normal. She said that, although appellant was pleasant, she seemed very anxious about M.P. and his health and would cry at times. She added that she never saw a real maternal bond between appellant and M.P.

Dr. Sisterhen stated that appellant admitted that she had disconnected the IV. She said that, even though the nurses had asked appellant not to do so, she did it again. She said that M.P.'s hospital stay was prolonged—which was risky—by appellant's reporting of his symptoms and tampering with the IV. Dr. Sisterhen said that, after Dr. Jones interviewed appellant, appellant asked her if he was a social worker. When she replied that he was a physician, appellant responded defensively, stating that she knew about Munchausen by Proxy. She conceded that she had no evidence that appellant had caused M.P. to run a fever or vomit but believed that this case was unusual because of appellant's history of appointments, calling after hours, and calling the primary care physician on his cell phone multiple times. Dr. Sisterhen said that none of the symptoms for which he was admitted were documented at the hospital, although appellant took his temperature rectally, indicating a fever, while he was there. She admitted that she had received a report of M.P.'s choking on a chicken nugget at the hospital and that, on November 13th, she had noticed a discharge crusted around M.P.'s ear and on the bed.

Jessica Hamilton testified that, on one occasion, she was called into M.P.'s room by appellant and found the IV tubing hanging on the pole. She said that appellant explained that she had worked in an emergency room and had disconnected the IV because she needed to remove M.P.'s shirt. Ms. Hamilton stated that she informed appellant that if she needed a nurse to disconnect the IV, she should let one of the nurses know, because that was their responsibility. She said that, even though appellant appeared to understand this, the IV was again disconnected and clamped in two different places. She stated that she again explained to appellant that she should not touch the IV equipment. She said that the child's chart indicated that someone had removed the ace wrap with the IV house and had clamped the tubing near the IV. Ms. Hamilton testified that it is the hospital's practice to check the patient's temperature orally or under the arm, and when she checked M.P.'s temperature and determined he had no fever, appellant personally took M.P.'s temperature rectally. Ms. Hamilton said that, on another occasion, appellant came to the nurses' station, stating that he had been throwing up since he was born and that he needed a scope. According to Ms. Hamilton, M.P. was a normal, active, and smiling eleven-month-old, and she never observed a fever, although he did vomit once during the three days that he was under her care. She also said that she did not believe that appellant's explanation of M.P.'s feeding history was consistent.

Skye Adams, who did the child-abuse assessment, testified that appellant was upset when she learned that the team at ACH was going to report the case to the Child Abuse Hotline. She said that appellant yelled at her but soon after apologized for her behavior. Ms. Adams's assessment was admitted into evidence. This report noted that appellant is bipolar, re-

ceives disability, and had lost a child fifteen years ago. Christine Jeffrey testified that, while M.P. was in her care for two days (in a room with a video camera), she saw appellant adding something to M.P.'s bottle to thicken it, contrary to doctor's orders. She also said that appellant moved M.P.'s crib partially out of the video camera's view. She stated that appellant became angry at the social worker, but appellant made no threats and later apologized.

Craig Jones testified that DHS had referred appellant to his care, and that, since December 11, 2009, he had seen her five times. He said that it was too soon to arrive at a psychiatric diagnosis for her, but his provisional diagnosis was that she suffered from an adjustment disorder, unspecified, a recently resolved relational issue with a partner, and, based on her description of services that she had received through the Veterans Administration, borderline personality disorder. He emphasized, however, that he needed more information and was not able to make a firm diagnosis of the neglected child's perpetrator.

Dr. Chad Rodgers testified that he had served as M.P.'s pediatrician all of his life and had seen M.P., who was premature, about eleven times, most recently a month before the hearing, for ear infections, wheezing, reflux, vomiting, diarrhea, runny nose, and cough. He stated that appellant had not called him on his cell phone until the hospitalization and explained that he had previously instructed appellant to add some cereal to M.P.'s bottle to help with his reflux. He admitted that he had become concerned in November 2009 because, even though appellant had reported a lot of vomiting and refusal to drink, M.P. appeared very well and hydrated in his office visits. He said that he trusted Dr. Jones's assessment. He stated that he

knew that appellant had lost a child and that M.P. was the only child she would be able to have, and described her personality as a little dramatic and over-concerned. He said that M.P. was happy, growing well, and had a pretty good relationship with appellant, and that, if he had believed that maltreatment had occurred, he would have reported it.

Roderick Rhodes and Brooke Hobby testified that they believed that appellant is a good mother to M.P. Appellant testified that, after working as a certified nursing assistant, she had joined the Navy, from which she was discharged on disability after two years because of back, knee, and shoulder problems. She said that her first child had died shortly after birth and she had miscarried before becoming pregnant with M.P., who was born two months prematurely. She said that she and M.P. had lived with her parents since she separated from her husband. Appellant testified that M.P. had spit up frequently and that the doctor had told her to add rice cereal to his bottle to help with reflux. She said that she had taken him to the Little Rock Pediatric Clinic and hospital after-hours clinics for well-child visits, reflux, ear infections, asthma, allergies, pneumonia, cough, runny nose, and fever; that she had handled many of her questions by calling the nurse at the medical exchange; that an ear, nose, and throat specialist had seen M.P.; and that M.P. had been circumcised at ACH.

Appellant testified that she had taken M.P. to the emergency room on October 29 and November 9 and 10, 2009. She said that, on November 9, he had a fever of 105.9 degrees, was lethargic, and vomiting; he was discharged early the next morning. The next day, she said, she took M.P. to Dr. Rodgers's office because he had stopped taking his bottle; Dr. Rodgers ordered some blood work and told her to

see if she could get M.P. to drink any fluid. At home, she said, M.P. drank some Gatorade but threw up some pizza. Appellant said that his temperature went to 103.4 degrees, and she called the medical exchange for Dr. Rodgers; she then took M.P. to the emergency room at ACH, where he was admitted. Appellant said that, when M.P. was first admitted, Dr. Sisterhen told her to feed him whatever he wanted, with no restrictions, and that she was permitted to keep his labeled rice cereal, soy-milk formula, and baby-food fruit in the hospital refrigerator. She explained that she moved his crib in the next room to which he was assigned because the light was shining on his head; she was not aware that there was a camera in the room.

Appellant acknowledged disconnecting M.P.'s IV on the 11th so she could change his shirt, after getting no response to her request for help from his nurse, Jessica Hamilton. She said that she then asked the nurse to reconnect it, and a male nurse came in, cleaned off the tubing, and reconnected it; it was disconnected for only two or three minutes. She also explained her disconnection of the IV tubing on the 12th after M.P. had pulled loose the brown stocking that covered the plastic cap over the site of the IV; this stocking was designed to keep the baby from pulling the IV out. She said that, even though she asked for help with the stocking from the nurses, they did not provide any help, and M.P. pulled the stocking all the way up his arm and grabbed the tubing. Appellant described her two choices at that point:

> I could undo it and hang it back over and stop him from pulling on the tubing, or I could let him continue to do it and risk a chance of him actually pulling the actual tube out and catheter out and have to re-site the IV. . . . So I called the nurse again, and I had told them what he was doing. I got no response.

I sat there, and I was holding him for about 15 minutes waiting. . . .

> . . . So I unhooked it, and I hung it back over the top. And I sat there, and I was holding him. So what happened was the alarm started going off, and it beeps when it's not connected. So what happened was I silenced it, and I called the nurse. . . . I said, his monitor's going off. I said, I've asked ya'll would you please come back in here and fix the stocking on his arm and reconnect the tubing. I said because he's going to pull his IV out. It was about ten minutes later, and I'm rocking him, and this curly-headed nurse comes in and she has a gentleman behind her, and I haven't been introduced to her. She wasn't my nurse for that night. They were in the middle of shift change. But it's not documented in her notes. So the nurse comes in, and I sat M.P. down on the bed. And she lifts up the cap, the plastic thing that's over there, and you've got to keep in mind I've already pulled the stocking off. So she lifts up the cap and there's tape over the cap. So she lifts up the cap, and she's messing with it underneath, and she takes the tubing, and she didn't even wipe it off with alcohol swab. She takes the tubing and she sticks it back in there, and she goes, I don't even know, she goes, I don't even know what I'm messing with here. . . . I don't even know how this goes on. But I assume she reconnected it because she messed with the machine, and she started letting it flow again. And it wasn't showing occluded, and I'm sorry that I'm using these terms. You have to understand I worked in the emergency room, and so I know what-anyway it wasn't showing occluded. It was showing that it was flowing. So I assume that it was running. So I put M.P. back, and we were rocking in the chair. So

we're rocking, no problem. I'm still waiting for the stocking to be replaced because it still at this point has not been replaced. So I'm having to hold him. So I noticed that my shirt is wet. And I've got this big wet spot down here. So I pull M.P. away from me, and I look down, . . . and I feel his diaper, and he's not wet. And then I look down around me. And then his IV tubing is sitting down on the floor. And so there's a big puddle of water. So I called the nurse again. . . . I said his IV tubing is down on the floor, and my shirt is wet. And they said, okay, Ms. Parker. We'll send somebody in. So I'm automatically assuming they're thinking, okay, well, she did this. And so when finally the nurse came in it was my nighttime nurse, the 7:00 p to 7:00 a, and I don't remember her name. She didn't introduce herself. . . . And I explained to her that the curly-headed nurse with the gentleman behind her had just came in and reconnected the IV. And she asked me why it was disconnected in the first place for her to come in. I said, because I had, he had pulled his stocking off, and he was pulling on his IV. I said, I went to the front desk. I asked for some scissors to replace the stocking, and they said they would order some up. She said, oh, yeah, I got the scissors, but they're not supposed to be on the unit so I took them away. And we were in the middle of shift change. So I told her, I said, I was rocking him. I got this wet spot. I thought he had wet through his diaper. I looked down, the IV tubing's on the floor. And I said, hence why it's hanging up over here again. So I said, there it is disconnected again. So I wasn't aware that anything was clamped off under here or anything because I didn't touch it.

In the adjudication order, the circuit court made the following findings:

4. The Court finds that the juvenile, M.P. . . . is dependent-neglected as a result of parental unfitness, neglect, and abuse. The Court finds that the juvenile has been subjected to Pediatric Condition Falsification, Munchausen syndrome by proxy, also known as factitious illness by proxy, as reported and confirmed by medical personnel or a medical facility.

. . . .

13. The Court carefully considered the testimony of . . . all witnesses, found the testimony of Dr. Jerry Jones and Dr. Laura Sisterhen to be the most credible. Specifically, the Court carefully considered the mother's testimony and found her not to be credible. The Court finds that Kristin Parker gave unsatisfactory explanations for disconnecting or otherwise tampering with the child's IV. Physicians at Arkansas Children's Hospital, Dr. Laura Sisterhen and Dr. Jerry Jones, were unable to observe or confirm the conditions and symptoms reported by the mother, i.e., fever, vomiting, dehydration, diarrhea, lack of urine output, gagging, choking, reflux, difficulty in swallowing, etc. There was no clinical evidence of the mother's reported illnesses. The mother's reported history, at best, included inconsistencies; i.e. she reported that the child had not eaten properly for two months; however, the child is in the 96th percentile for his age and weight. The result of this, at best, included unnecessary hospitalization and treatment for M.P., which increased the risk of infection.

The court set reunification as the goal and continued supervised visitation.

On appeal, appellant argues that the evidence did not support the circuit court's finding that the child was dependent-ne-

glected. She points out that she has not been diagnosed with Munchausen Syndrome by Proxy; that M.P. was diagnosed with illnesses on the occasions that he was taken to the emergency room; that there was no evidence that she caused those illnesses; that he did not undergo unnecessary medical procedures; and that he had to see the doctor after he was in foster care. She also asserts that Dr. Jones's conclusion was based on nothing more than speculation and was offered as a rationalization for the hospital's conduct toward her when their relationship became strained. Although appellant admits that she removed M.P.'s IV, she points out that no harm resulted. She contends that there was no basis to conclude that she was abusive for simply being attentive to her child's medical needs.

■ Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof. Ark. Code Ann. § 9–27–327(a)(1) (Repl.2009). Dependency-neglect allegations must be proven by a preponderance of the evidence. Ark.Code Ann. § 9–27–325(h)(2)(B) (Repl.2009). We will not reverse the circuit court's findings unless they are clearly erroneous. *Seago v. Arkansas Dep't of Human Servs.*, 2009 Ark. App. 767, 360 S.W.3d 733. In reviewing a dependency-neglect adjudication, we defer to the circuit court's evaluation of the credibility of the witnesses. *Id.*

Arkansas Code Annotated section 9–27–303(18)(A) (Repl.2009) defines a "dependent-neglected juvenile" as any juvenile who is at substantial risk of serious harm as a result of abuse, among other acts or omissions. Section 9–27–303(3)(A)(vii)(j) defines "abuse" as "[s]ubjecting a child to Munchausen syndrome by proxy, also known as factitious illness by proxy, when reported and confirmed by medical personnel or a medical facility." The statute does not require that actual physical injury occur. Munchausen syndrome by proxy has been defined as follows:

> Munchausen syndrome by proxy is the name given to factitious disorders in children produced by their parents or caregivers. The American Psychiatric Association defines factitious disorder by proxy as "the deliberate production or feigning of physical or psychological signs or symptoms in another person who is under the individual's care," motivated by the perpetrator's need to assume the sick role by proxy. Munchausen syndrome is distinguished from Munchausen syndrome by proxy in that the medical attention is sought for oneself.

*In re Hope L.*, 278 Neb. 869, 895–96, 775 N.W.2d 384, 402 (2009).

■ We recognize that the evidence presented at the adjudication hearing by DHS was countered by evidence that, before M.P.'s admission to ACH in November 2009, no medical professional had raised any concerns about appellant's behavior or M.P.'s well-being; that M.P. was born prematurely; that it is not unusual for premature infants to have reflux; that M.P. had suffered from ear infections frequently enough to warrant the surgical placement of tubes in his ears at ACH; and that M.P. was happy, active, well-nourished, and growing well. Nevertheless, we do defer to the trial court's superior position to observe the parties and judge the witnesses' credibility. Given the standard of review that we follow in cases such as this, we cannot say that the circuit court's findings were clearly erroneous.

Affirmed.

VAUGHT, C.J., and GLOVER, J., agree.