Cite as 2020 Ark. App. 455

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-20-111

|  |  |
|---|---|
| | **Opinion Delivered:** September 30, 2020 |
| KRISTY SCHNEIDER AND ERIK SCHNEIDER<br>APPELLANTS | APPEAL FROM THE SALINE COUNTY CIRCUIT COURT [NO. 63JV-19-271] |
| V. | HONORABLE GARY ARNOLD, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br>APPELLEES | AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellants Kristy and Erik Schneider appeal the December 3, 2019 adjudication order by the Saline County Circuit Court finding that their son, L.S., was dependent–neglected due to abuse (Munchausen syndrome by proxy), neglect, and parental unfitness. Appellants argue first that the DHS/Children's Hospital interpretation of "Munchausen Syndrome by Proxy, also known as factitious illness by proxy" accepted by the circuit court is at odds with both the statutory requirement and the definitions accepted within the medical profession. The application of this ad hoc definition also violates constitutional guarantees. This misapplication fatally taints the allegations against both parties. Next, they contend that the circuit court's posthearing attempt to redefine the allegations violates rules

of procedure, constitutional requirements, and the court's own pretrial guarantees. Finally, they argue that the circuit court's findings of facts are clearly erroneous. We affirm.[1]

Appellants adopted L.S. in Pope County in September 2014. L.S. has been diagnosed with a chromosomal abnormality, cognitive learning delay, seizure disorder, reflux, rumination, and heart rate variability with a pacemaker. These medical conditions required him to be seen and treated by several doctors at different clinics. In December 2018, he was admitted to Cincinnati Children's Hospital for testing. He was eventually placed in the pediatric intensive care unit (PICU) there due to issues with his heart rate and blood pressure. He was subsequently transferred to the PICU at Arkansas Children's Hospital (ACH) between late 2018 to early 2019. While in PICU, he received feeding through a feeding tube, known as a total parenteral nutrition (TPN). He also received a pacemaker due to ongoing issues with his heart rate and blood pressure. An epinephrine drip (EPI) was used at ACH to maintain L.S.'s heart function. Because the EPI was ineffective, ACH suggested that it be removed, and appellants were informed that no one knew what the outcome from removing the EPI would be. L.S. was discharged home on TPN on January 11, 2019, with hospice services in place. L.S. remained on TPN and was prescribed fentanyl and morphine.

Appellants concluded after meeting with ACH's palliative-care team that L.S.'s TPN would be withdrawn so that his natural death would occur. At the end of February 2019 L.S. returned to ACH for what was believed to be his final days alive. There was a send-

---

[1]This case was orally argued on September 16, 2020.

off parade for him, which included first responders from numerous agencies since it was reported that he wanted to see as many first responders as he could before he died. L.S. was taken off the TPN for nine days and appeared to look better than he had in months. Appellants decided to put L.S. back on TPN, and he stayed in the hospital for about a month. After his dismissal, he made several public appearances at baseball games, parades, etc.

L.S. was seen at the Mayo Clinic in Rochester, Minnesota, between May 28, 2019, and June 14, 2019. While at Mayo, he was seen by doctors in complex care, neurology, cardiology, GI, pulmonology, nephrology, urology, genetics, and pain management. He was placed on a new heart medicine, Digoxin, before he left Mayo. Mayo did not believe that L.S. was a candidate for hospice care at the time of his dismissal. It was anticipated that he would slowly wean off his pain medications; however, that did not take place until sometime in August. On August 9, Dr. Travis Ayers placed an order to have a port placed in L.S.'s chest. Dr. Spencer Lewis placed L.S.'s port on August 19, 2019, pursuant to Dr. Ayers's order.[2]

L.S. was readmitted to ACH on September 4 due to a possible infection of his port. He was discharged on September 6. DHS received a hotline report on July 20 concerning all the Schneider children, except P.S. The allegation was that Kristy was causing the children to be sick. DHS made contact with her on July 23 and went over the allegations. DHS spoke with L.S. at school on September 3 and 9. They also talked to P.S. on

---

[2]The port was subsequently removed in November, after approximately three months.

September 9. DHS spoke with school personnel on September 3 and sometime after September 9. A new hotline report was received on September 11 alleging that Kristy was misrepresenting the severity of L.S.'s condition, which was causing him unnecessary medical care, and interfering with knowing how to care for him. It was also alleged that Kristy was misrepresenting L.S.'s pain and providing false information between his different medical providers. DHS removed L.S. from appellants' custody that same day.

A petition for dependency-neglect was filed on September 13. It alleged that L.S. was dependent-neglected and at substantial risk of serious harm as a result of abuse, neglect, and parental unfitness. The supporting affidavit laid out additional facts and indicated that L.S. was removed because the caretaker was unwilling or unable to meet his needs for food, clothing, shelter and/or medical or mental healthcare. It also stated L.S. was removed because the caretaker failed to protect L.S. from serious physical or threatened harm. The medical affidavit of Dr. Karen Farst was also included with the petition. She stated that the misrepresentations by Kristy were making it impossible to accurately assess L.S.'s current condition and make accurate care and treatment plans. She further stated that his medical conditions placed him at substantial risk for complications if he is not provided an accurate treatment and care plan. The probable-cause hearing took place on September 18, and in the order entered on October 31, the court found that probable cause existed for DHS to remove L.S. and that the issues that led to removal still existed, making it necessary for L.S. to remain in DHS's custody.

The adjudication hearing took place November 14, 15, 20, and 21. Testimony and exhibits consisted of thousands of pages. At the conclusion of the hearing, the court

instructed the parties to submit proposed findings of fact and conclusions of law, which everyone did. Appellants filed objections to both DHS's and the ad litems' proposed findings and conclusions. The court filed an order on December 3 granting DHS's motion. The order stated in pertinent part:

3. The Court finds by a preponderance of the evidence that the juvenile is dependent-neglected and that the allegations in the petition are true and correct. The Court grants the request of the Department that the pleadings conform with the proof. The Court finds the juvenile was at substantial risk of serious harm from abuse, neglect, and parental unfitness, as alleged in the Department's Petition for Dependency Neglect, pursuant to Ark Code Ann. § 9-27-303 (18)(A)(ii); § 9-27-303 (18)(A)(v); § 9-27-303(18)(A)(vi). Specifically, as to abuse by mother, subjecting a child to Munchausen syndrome by proxy, also known as factitious illness by proxy (now also known as Pediatric Condition Falsification), when reported and confirmed by medical personnel or a medical facility. With regard to neglect by mother and father, the parents' failure or refusal to provide the necessary nutrition and medical treatment for the juvenile's well-being. Specifically, as to parental unfitness by mother and father, a fit parent would not exaggerate or misrepresent symptoms to medical professionals and a fit parent would not acquiesce to another caregiver's false reporting. The dependency neglect finding is based on the evidence presented at the hearing, which included the testimony of six medical providers, five of whom were qualified as experts in their fields, and medical records. This evidence established that [L.S.] has been portrayed by Kristy Schneider as being in significant and persistent pain even though this is not corroborated by medical providers. These representations resulted in the child being subjected to high doses of narcotics (including fentanyl, Ativan and morphine), an unnecessary medical procedure, and being denied nutrition, all of which threatened the child's health and potentially his life. Evidence also established that within days of being placed in DHS custody, [L.S.] transformed from a wheelchair-bound child on artificial nutrition, to an ambulatory child, able to eat normal food by mouth. The Court is exercising its discretion under ARCP l5(b) to amend the pleadings to conform to the proof with regard to specific findings based on testimony and evidence presented in this hearing.

4. The Court makes the following findings of fact:

a. [L.S.], dob: 5-27-2009, was adopted by Kristy & Erik Schneider in 2014.

b. [L.S.] has been diagnosed with a chromosomal abnormality, cognitive learning delay, seizure disorder, reflux, rumination, and heart rate variability treated with a pacemaker.

5

c. The Court finds Dr. Aime Jones, a physician at the Mayo Clinic in Rochester, Minnesota, to be an expert in the fields of pediatrics and complex care, and finds her testimony to be very credible. The Court notes that she testified via teleconferencing. Dr. Jones testified that she first learned of [L.S.] due to a family-initiated request for consultation, and she first saw him on May 30, 2019 when [L.S.] and his mother came to the Mayo Clinic. At initial evaluation, Dr. Jones found it interesting that medical outcomes were unusual based on the history provided. Ms. Schneider described severe pain for [L.S.] that were not observed in clinic. Dr. Jones asked Ms. Schneider to bring [L.S.] to clinic when he was in severe pain so they could evaluate; she never did so. Dr. Jones reported that a Pain Specialist documented that [L.S.] pointed to his stomach and said he was in pain, but the staff found that the child was in no distress. Dr. Jones stated that doctors treating children heavily rely on parents' descriptions of their children's pain and symptoms when deciding what treatments are warranted. Dr. Jones said that the Mayo team felt strongly that a careful wean of narcotics was needed in order to determine [L.S.'s] baseline medical conditions. She also reported that Ms. Schneider had taken [L.S.] to the Mayo emergency room because his PICC line had broken, and she had requested the insertion of a port in the ER, but that request was denied. Dr. Jones explained that a port is a surgically placed line in the chest, and that it was not necessary in [L.S.'s] situation, and would subject him to risks of blood clots and infection. Dr. Jones denied that [L.S.] had been diagnosed with dysautonomia, a dysfunction of the nerves that regulate nonvoluntary body functions such as heart rate, blood pressure, etc.

Dr. Jones testified that she had conversations with [L.S.'s] primary care physician in Arkansas, Dr. Meghan Repp. Dr. Jones said that it is common practice for Mayo to communicate with a patient's primary care physician, as this fosters continuity of care. Dr. Jones told Dr. Repp that she had some concerns about Ms. Schneider's representations of [L.S.'s] pain and had concerns her reports were not accurate. Dr. Jones informed Dr. Repp that Ms. Schneider endorsed and requested a port, but that Mayo did not support or agree with have a port placed in [L.S.]. Dr. Jones stated she confirmed this with the other doctors at Mayo. Dr. Jones stated Mayo's recommendation against a port was documented in her medical notes. As well, Dr. Jones testified that Ms. Schneider requested a referral for hospice, but Mayo did not agree that a hospice referral was warranted and declined her request. Dr. Jones testified that Mayo did not tell Ms. Schneider [L.S.'s] gut was broken or that [L.S.] had a poor prognosis. Mayo Clinic did not recommend that [L.S.] return to Mayo Clinic before trying oral feeds.

Dr. Jones said that although the Mayo Cardiology Department had discussed future appointments for [L.S.], the GI department did not have any scheduled appointments. In fact, Mayo recommended to Ms. Schneider that they contact Cincinnati Children's Hospital for requests for GI appointments due to

6

Cincinnati's expertise in pediatric GI. Dr. Jones testified that Dr. Repp asked her if Mayo recommend that [L.S.] had to be stable on digoxin before starting his narcotics wean, and Dr. Jones told her this wasn't accurate; rather, Mayo recommended starting the narcotics wean immediately. Dr. Jones informed Mrs. Schneider that if chronic pain was an issue for [L.S.], she recommended he see a psychologist or their TENS unit. Dr. Jones mentioned that Ms. Schneider had contacted Mayo since September 11, 2019, the date that [L.S.] was placed in the custody of the Arkansas Department of Human Services, to try and schedule a return appointment for him.

Dr. Meg[han] Repp testified that she has been [L.S.'s] primary care physician since April 2018. The Court finds Dr. Meghan Repp to be an expert in pediatric medicine and finds her testimony to be very credible. Dr. Repp testified that she relies on caregiver reporting and that if she is provided misinformation it could result in an inappropriate treatment plan for a patient. Dr. Repp started having concerns over the first 3-4 visits. Specifically, Ms. Schneider showed Dr. Repp a photo of [L.S.'s] GJ site which appeared red and possibly infected. When Dr. Repp examined [L.S.] in person the next day, the site did not appear infected and Dr. Repp found this to be unusual. Ms. Schneider, on more than one occasion, reported to Dr. Repp that [L.S.] had swelling and vital sign abnormality-specifically low blood pressure and heart rate. Dr. Repp never found swelling on [L.S.] upon examination, and had the school nurse check his blood pressure and heart rate on multiple occasions and those reports were normal. Dr. Repp had concerns that [L.S.] was malnourished and recommended that Ms. Schneider try to increase either the number of calories or the rate of [L.S.'s] feeds. Dr. Repp recommended she try this through either his GJ tube or through oral feeds. Ms. Schneider consistently reported that when she tried to increase the calories or rate of feeds it would cause abdominal pain and distention. Dr. Repp found this unusual because she was recommending small changes that typically do not cause any pain. Dr. Repp provided support to the Schneider family when they made the decision to admit L.S. to the hospital and have his TPN nutrition stopped in March of 2019. Dr. Repp testified that she was never under the impression that the Schneiders felt pressured by ACH to withdraw the TPN. Dr. Repp testified that she thinks the reason [L.S.'s] health improved while he was at the hospital for his TPN withdraw was because the hospital was allowing him to drink liquids and eat popsicles upon request. During a home visit prior to his hospital admission, Dr. Repp saw [L.S.] ask his mother for a popsicle. Despite the doctor's encouragement, he was not given a popsicle during her visit. Dr. Repp spoke with Ms. Schneider after the TPN withdraw was stopped, and found it odd that she made the comment that [L.S.] "did a bad job of dying."

Dr. Repp testified at length about her concerns regarding Ms. Schneider's reports of pain for [L.S.]. She examined [L.S.] 23 times, and only on 2 examinations did she observe abdominal pain. On those 2 exams, the pain was

7

not severe and [L.S.] was able to be distracted from the pain. Dr. Repp stated that Ms. Schneider continued to report abdominal pain and distention in the months leading up to [L.S.] entering foster care. Dr. Repp testified that she had very specific concerns regarding Ms. Schneider's report of pain on August 28, 2019. Ms. Schneider contacted Dr. Repp's office and reported significant pain, to the point it was recommended she take [L.S.]to the ER if she is truly unable to control his pain. Dr. Repp's medical note states that Ms. Schneider reported "he has been off his fentanyl and morphine for 2 weeks now, and ever since getting below 50 mcg per day of fentanyl, he's crying out about abdominal pain during the day and night." "She also states 'we are at our breaking point.'" After checking the next day, Dr. Repp learned that [L.S.] was not taken to the ER to have his pain evaluated. Similarly, Ms. Schneider contacted Dr. Repp's office on September 3, 2019 with concerns that his port site was infected. Dr. Repp testified that a port site infection could be very dangerous, and it was recommended that she take [L.S.] to the ER to have the site evaluated. Dr. Repp learned that [L.S.] was not taken to the ER, rather he was on a float the Saline County parade the evening of September 3, 2019. He was taken to the ER later the next day.

Dr. Repp testified that she had several conversations with Ms. Schneider after she returned from the Mayo clinic in June 2019. Dr. Repp obtained the records from Mayo prior to meeting with Ms. Schneider. Ms. Schneider also provided Dr. Repp with Mayo records, but Ms. Schneider omitted the record regarding pain management and recommending the narcotics wean. Dr. Repp was concerned that Ms. Schneider failed to mention, at all, that Mayo recommended weaning [L.S.'s] narcotics. Dr. Repp's concerns regarding the narcotics wean were documented in detail in her medical records. Ms. Schneider informed Dr. Repp that Mayo recommended [L.S.] should be stable on his digoxin prior to starting the narcotics wean. Dr. Repp found this unusual, and when she contacted Mayo she learned this was not their recommendation. Ms. Schneider informed Dr. Repp that Mayo, specifically Dr. Jones, recommended [L.S.] have a port placed for his TPN feeds. Dr. Repp found this very unusual because it was her understanding they were going to try and move away from TPN and get [L.S.] back on feeds. Ms. Schneider informed Dr. Repp that Mayo said [L.S.'s] gut was broken. Ms. Schneider informed Dr. Repp that once [L.S.] was weaned from his narcotics, he was to return to Mayo for further gut testing, and shouldn't try oral feeds prior to the gut testing. Dr. Repp told Ms. Schneider that she would confirm this with Dr. Jones, at which point Ms. Schneider stated that maybe it wasn't actually Dr. Jones who made the recommendation for a port, but a nurse named Amy. Dr. Repp contacted Dr. Jones who informed her that no one at Mayo recommended a port, and in fact they strongly disagreed with [L.S.] receiving a port. Dr. Repp also checked with Mayo clinic who informed her that [L.S.] did not have any future GI appointments at Mayo, and they had recommended she return to Cincinnati Children's Hospital for any future gut

8

motility testing. Dr. Repp testified at length about her concerns that Ms. Schneider was resistant to weaning [L.S.'s] narcotics. Dr. Repp testified that Arkansas Children's Hospitalist, Palliative Care, and Mayo Clinic had all discussed weaning narcotics, and ultimately it was only at the insistence of Arkansas Children's Hospital (ACH) that the wean was initiated. ACH recommended admitting [L.S.] to the hospital for the wean, but ultimately allowed Mr. and Ms. Schneider to do the wean at home. Dr. Repp also recommended that [L.S.] see a psychologist to help him deal with pain control but Ms. Schneider did not want to pursue this treatment because she herself was a therapist and could handle [L.S.]. Dr. Repp testified that she has had training in child abuse pediatrics, but that is not her specialty, and she relied on both her training and communication with the child abuse pediatrician at Arkansas Children's Hospital (Dr. Karen Farst) regarding how to handle [L.S.'s] care. Dr. Repp testified that her training was clear in cases of suspected Munchausen's by Proxy cases that the doctors must start collaborating with each other prior to questioning the caregiver about their suspicions. Dr. Repp testified that earlier this spring [L.S.] was small, appeared malnourished, was quiet and kind, often in a wheelchair and on oxygen. She has seen him 3 times since he entered foster care and he had gained approximately 7 lbs, was walking and jumping, and was not on oxygen. In addition to her concerns regarding the discrepancies in Ms. Schneider's reporting of symptoms and Dr. Repp's examination of [L.S.], Dr. Repp also had concerns regarding the Schneider family interactions. Specifically, she attended a farewell party for [L.S.] at ACH, followed by a private Baptism ceremony at Arkansas Children's Hospital therapy pool. These events were scheduled after the decision was made to remove TPN and the expected outcome was [L.S.'s] death. Dr. Repp was concerned that [L.S.] was notably upset at the baptism, and neither Mr. nor Ms. Schneider comforted [L.S.] at all, although at one point his brother did approach him and comfort him. Dr. Repp testified that she agrees with Dr. Farst's pediatric diagnosis for [L.S.], Munchausen's by Proxy.

Dr. Karen Farst, director of the Team for Children at Risk (hereafter TCAR) at Arkansas Children's Hospital, also testified at the hearing and was qualified as an expert in the fields of pediatrics and child abuse pediatrics. The Court finds her testimony to be credible. She stated that after reviewing [L.S.'s] medical records from various providers, talking with his doctors and the Arkansas Department of Human Services, and after [L.S.'s] transformation after he was separated from his parents, she concluded that [L.S.] was a victim of Munchausen by Proxy, which also is known as Pediatric Condition Falsification or Medical Child Abuse. She emphasized that as a pediatrician, she can make this diagnosis and that it is not a mental health diagnosis of the parents. She was first asked to review [L.S.'s] medical case in January 2018, because there were concerns by his treating physicians that that his symptoms were being exaggerated by the parent. She reviewed his chart and talked with his doctors and declined to make a report at that time. Dr. Farst was consulted again in April 2019 for continuing concerns

that Mrs. Schneider was exaggerating or misrepresenting [L.S.'s] symptoms, but no report was recommended. At that point, the family's plan was to seek additional opinions regarding [L.S.'s] condition from other providers outside Arkansas. After Texas Children's and Dallas declined to see [L.S.], Mayo agreed to see him outpatient in May 2019. Dr. Farst said TCAR wanted input from other providers before making a decision regarding whether a report to the hotline was needed. In making her report regarding suspicion of Munchausen by Proxy, Dr. Farst primarily focused on the time period of May 2019 to present. Records indicated that [L.S.] was seen at outpatient clinics at Mayo for about two weeks in late May and early June 2019. [L.S.] saw a multitude of doctors at Mayo, and there was consistency in reports from those doctors that Mrs. Schneider's accounts regarding [L.S.'s] symptoms did not match what the doctors were seeing. Mayo instructed Mrs. Schneider to begin to wean narcotics to see how intestines were working. Once [L.S.] returned to Arkansas, the parents did wean Fentanyl at home, but continued to describe [L.S.'s] quality of life as poor due to pain. Ms. Schneider told doctors at Arkansas Children's Hospital that Mayo wanted to see [L.S.] back and to finish testing, although Dr. Repp, [L.S.'s] PCP, later found this to be untrue. Ms. Schneider insisted to the Palliative Care Team at ACH that Mayo wanted him to have a port for longer term Total Parenteral Nutrition or TPN, which is intravenous feeding, rather than continuing to use his PICC (peripherally inserted central catheter) line. Based on Ms. Schneider's assertions, a Port was placed on August 19, 2019. Ms. Schneider continues to tell Dr. Repp that [L.S.'s] quality of life is poor if he is on less than 50 micrograms of fentanyl. On August 27, 2019, DHS contacted Dr. Farst, because the hotline had received reports from the community, with concerns about [L.S.'s] wellbeing.

Farst reported that [L.S.] was admitted to ACH for a possible port infection on September 4, 2019, and Mrs. Schneider continued to insist that [L.S.] was in terrible stomach pain and that if his Gastrojejuno[s]tomy Tubes were clamped, he had distension of his stomach and increased pain. Because of these assertions, she argued against weaning him from Ativan, another narcotic. While [L.S.] was hospitalized, a multi-provider meeting was held at ACH to discuss concerns about [L.S.'s] condition and the parents' possible misrepresentations of his condition. Palliative care staff recommend[ed] that [L.S.] begin to wean from the Ativan while in the hospital; parents were resistant to this directive, and he was discharged on September 6, 2019, with instructions to wean at home. On September 11, 2019, Palliative Care called mom to check on [L.S.], and Mrs. Schneider told them that he was in significant pain and that it was not the time to wean the Ativan. That day, a hotline report was made due to concerns about Mrs. Schneider continuing to exaggerate symptoms, and [L.S.] was admitted to the hospital in DHS custody.

Dr. Farst explained that separating him from his parents while in the hospital was a definitive way to determine his health baseline and to determine his true condition. After being in the hospital starting on September 11, 2019, [L.S.] made a profound transformation in the first two days. He was admitted to the hospital in a wheelchair, on oxygen, allegedly in profound pain, receiving TPN feeds and nothing by mouth and with GJ tubes. Dr. Farst reported that [L.S.] initially stated that his abdominal pain was 10 out of 10 on the pain scale, but his smile and demeanor belied that report. He was not showing any guarding or tensing of his abdominal muscles when he reported pain. Medical staff clamped his J-G Tubes and fed him macaroni and cheese, to his delight and without any side effects. By the time of discharge on October 4, 2019, [L.S.] was out of the wheelchair, eating solid foods exclusively, off oxygen, and receiving all his medications orally. His J-G tube was removed after discharge, on November 5, 2019. He progressed from the fifth percentile in weight to the twentieth percentile. Dr. Farst stated that given the parents' history of exaggerating and misrepresenting [L.S.'s] symptoms, triangulating between [L.S.'s] numerous medical providers, and his transformation once in DHS custody, she had concluded that he suffered from Munchausen by Proxy (also known as pediatric condition falsification or child medical abuse.)

Dr. Farst was questioned by parent counsel regarding the validity of her diagnosis of Munchausen by Proxy, given that she was not a mental health provider and didn't use the Diagnostic and Statistical Manual of Mental Health Disorders to make her diagnosis. She explained that as a pediatrician, she was making the diagnosis on the child rather than the parent, and that her diagnosis was consistent with the medical literature on the issue, including the Squires article that was introduced as Attorney ad Litem Exhibit number 1. Dr. Farst also noted that to her knowledge the mother was the primary caregiver of [L.S.] in the home, although the father was present in the home.

Dr. Carrie Brown, a palliative and complex care physician at Arkansas Children's Hospital, was qualified as an expert in palliative care and complex care. The Court finds Dr. Brown's testimony to be credible. Dr. Brown testified that she first started treating [L.S.] around January 2018 due to his complex medical issues. Dr. Brown was approached by a locum GI physician in 2018 who expressed concerns about Ms. Schneider accurately reporting [L.S.'s] symptoms. As a result, Dr. Brown had conversation with Ms. Schneider about the importance of accurately reporting symptoms and not exaggerating any issues. Dr. Brown believed Ms. Schneider thereafter and thought her reporting was accurate. Dr. Brown set aside what the locum doctor told her. Dr. Brown testified that she was trained to believe the caregiver when they describe their child's symptoms and condition. In March 2019 [L.S.] was at home on hospice care. Dr. Brown, Mr. and Ms. Schneider, and other medical professionals were all involved in conversations about admitting [L.S.] to the hospital to stop his

TPN nutrition. Dr. Brown testified that the expected outcome of withdrawing his nutrition would be death. Dr. Brown stated that based on the reports given by the Schneiders regarding symptoms and quality of life, ACH agreed this decision was an option for the family. Dr. Brown stated that Mr. Schneider was present at these meetings and agreed with Ms. Schneider's reporting and comments. In spring 2019, Dr. Brown made the referral for [L.S.] to go to Mayo clinic. When [L.S.] returned, the issues that Dr. Brown personally addressed were urology, pain, and the narcotics wean. Ms. Schneider reported that Mayo recommended start[ing] the narcotics wean once [L.S.] was stable on his digoxin, in about 1-2 weeks. Ms. Schneider reported that once the narcotics wean was complete, [L.S.] was to return to Mayo clinic for gut motility testing. Based on this information, Dr. Brown recommended finishing the narcotic wean and then sending [L.S.] back to Mayo. Ms. Schneider reported that [L.S.] could not tolerate anything in his G-tube without it causing distress. Dr. Brown has seen this in other patients, and believed Ms. Schneider's report despite the fact that she had not observed [L.S.] in distress. Dr. Brown also confirmed that [L.S.] did report pain himself, although she was not sure if he was actually in pain. [L.S.] was admitted to the hospital September 4-6 for a possible port infection. The Ativan wean was discussed at the hospital at this time, and ACH recommended weaning the Ativan at the hospital. Mr. and Ms. Schneider felt like ACH did not trust them, and wanted to do the Ativan wean at home. [L.S.] was discharged with Ativan wean instructions. Dr. Brown called Ms. Schneider on September 11, 2019 to find out how the Ativan wean was going. Ms. Schneider reported that it was not going well and [L.S.] was still having significant pain, not tolerating the Ativan wean, and Ms. Schneider stated it was not discussed about why the Ativan was being weaned right now. Ms. Schneider stated that Mr. Schneider wanted to go to the Administration because communication had stopped. Dr. Brown later learned that Ms. Schneider had filed a grievance against her, but she did not know about the grievance when she placed the phone call on September 11, 2019. Dr. Brown has not treated [L.S.] since she found out about the grievance.

Lynn Dees, a pediatric APRN under Dr. Carrie Brown at ACH, testified that she first met [L.S.] around January 2018. The Court finds Lynn Dees testimony to be credible. Lynn Dees testified that she became close with Ms. Schneider during the course of treating [L.S.], and she was involved in the conversations about the narcotic wean after the Mayo visit in May-June 2019. Ms. Schneider reported that the narcotic wean was progressing, but that [L.S.'s] pain was worsening. In a medical note dated August 3, 2019, Ms. Schneider reported to Lynn Dees that Mayo told her the plan was to go back in the next 4 months or so to try and test [L.S.'s] GI system. The note reads "I know they will test his gut again, but there truly didn't seem to be much optimism because the system was broken even before this all began in December." The note also reads "we are certainly on TPN for the foreseeable future–until we return to Mayo and get more information–and thus we hope we could transition to a port as soon as

12

possible." Lynn Dees testified that Ms. Schneider stated Mayo first brought up the port to her, and this was also reflected in Lynn Dees medical notes. Lynn Dees contacted the pediatric GI doctor at ACH to let him know that Ms. Schneider was requesting a port, and that the palliative care team's understanding was that [L.S.] was to return to Mayo once he was off narcotics to pursue GI motility testing. Lynn Dees testified that Ms. Schneider reported if she clamped the bags attached to [L.S.'s] GJ tubes, it would create abdominal distention.

Dr. Travis Ayers testified and was found to be an expert in the field of pediatric gastroenterology. The Court finds Dr. Ayers to be a credible witness. Dr. Ayers stated that he first met [L.S.] about a year ago and still cares for him today. Dr. Ayers testified that after [L.S.] was seen at Cincinnati Children's Hospital, he oversaw [L.S.'s] TPN orders. Dr. Ayers explained that [L.S.] currently has reflux and rumination, but that the rumination is being addressed by [L.S.'s] psychologist, Dr. Brandi Whitaker. Dr. Ayers emphasized that, as a pediatric gastroenterologist, he relies on the parents' reporting of symptoms when making decisions. He stated that every time he saw [L.S.] and his mother, Ms. Schneider would tell him that, "We know his gut doesn't work." After [L.S.] returned from the Mayo Clinic, Mrs. Schneider reported that Dr. Spencer Lewis, an interventional radiologist, wanted to place a port. Thereafter, on August 9, 2019, Dr. Ayers placed the order for the port.

Dr. Ayers stated that there was always a suspicion that [L.S.] could tolerate oral feeds. When [L.S.] was admitted to ACH on September 11, 2019, Ayers told the staff to clamp his G–J tubes. [L.S.] didn't have abdominal pain from the tubes being clamped, so Dr. Ayers authorized oral feeds for him. Dr. Ayers stated that [L.S.] would eat "macaroni and cheese until he was blue in the face." Eating was clearly giving him pleasure and there were no side effects. Dr. Ayers ordered a slow withdrawal of the TPN. Dr. Ayers reported that [L.S.] is significantly better. He was jumping around the room, excited about eating, and talking nonstop. Ayers indicated that [L.S.'s] port was removed on November 18, 2019.

Dr. Spencer Lewis, an interventional radiologist with Arkansas Children's Hospital, was called as a witness by defendant, and the Court finds him to be a credible witness. Dr. Lewis testified that he placed [L.S.'s] port on August 19, 2019, pursuant to an order by Dr. Ayers. Dr. Lewis explained that a port is placed under the skin and can last years. The port is placed under general anesthesia and the surgery usually takes about 1 to 1 ½ hours. He stated that if TPN was needed for a long time, then the port is appropriate. He said that the port could have been placed by either radiology or by general surgery. Dr. Lewis stated that he was aware that the port had been removed recently.

5. The Court finds that the father, Eric Schneider, contributed to the dependency-neglect of the juvenile. Father is a caregiver of the juvenile and lived

in the home. By his own description, Mr. Schneider is the "leader of the house," and stated that he makes the final decisions on major issues in the family. He participated in the meeting where it was determined that TPN would be withdrawn, participated in the decision to have a port placed in the juvenile, and met with the cardiologist at Mayo Clinic, and by his own testimony does not think that his wife misrepresented or exaggerated any symptoms of [L.S.]. He testified that he was frustrated with ACH in September 2019 because he felt they were not treating [L.S.'s] gut problems or working with the family on his Ativan wean. Upon further questioning Mr. Schneider acknowledged that once [L.S.] entered foster care, the only change in [L.S.'s] treatment was to clamp his tubes and later feed [L.S.] food. Mr. Schneider is not a fit parent who can meet the juvenile's medical, emotional, and physical needs. He has not demonstrated that he can protect his child from unnecessary medical treatment. Mr. Schneider's reliance upon *Young v. Ark. Dept. of Human Servs.*, 2018 Ark. App. 270, is misplaced as *Young* is distinguishable from this matter. Here, Mr. Schneider, by his own testimony, participated in decisions that ultimately affected the medical treatment of his son.

6. Defendants' argument at this hearing is that the juvenile's change in medical condition was based on the fact that he completed his narcotics wean shortly before entering foster care, and that is the basis for his recovery. The Court finds this argument implausible, based on the testimony presented at this hearing. The Court finds that the parents' misrepresentation of the juvenile's medical condition, to multiple doctors over an extended period of time, resulted in unnecessary medical treatment and procedures. Most notably, the juvenile had a port placed in his chest. This is a surgery that was done under general anesthesia–the juvenile later had to have the port removed under general anesthesia once he was placed in foster care

7. Counsel for Ms. Schneider argues that the Department has not met its burden with regard to his client, because a mental health provider has not diagnosed her with Munchausen by Proxy. However, the statute in question, Ark. Code Ann.§ 9-27-303 (3)(A) vii (j) defines abuse as "Any of the following intentional or knowing acts, with or without physical injury. . .(j)Subjecting a child to Munchausen syndrome by proxy, also known as factitious illness by proxy, when reported and confirmed by medical personnel or a medical facility." The statute does not require that a mental health professional make the diagnosis; it only requires that the conditions be reported and confirmed by medical personnel, and Dr. Farst meets this condition. (*See also Parker v. Ark. Dept. of Human Servs.*, 380 S.W.3d 471 (2011).)

Kristy filed a notice of appeal on December 9. She also filed a notice of objection

of the court's amendment to allegations and motion for vacation of the adjudication order.

In the motion, she challenged the sufficiency of the evidence to support dependency-neglect

based on Munchausen syndrome by proxy, she contended that her due process was violated when the court made the posttrial amendments, and she also claimed the court's amendment violated Arkansas Rule of Civil Procedure 15(b). She asked the court to vacate it adjudication order. Erik filed a notice of appeal and objection that same day. His objection was almost identical to Kristy's objection. DHS and the ad litems filed a joint response to the motions and objections on December 23. The court filed orders on December 31 denying appellants' motions for vacation of the adjudication order. It stated that the petition alleged abuse, neglect, and parental unfitness and the evidence at trial supported the petition for dependency-neglect, but provided more detail and illustrations than what had been initially pled. It said that it allowed appellee to amend its pleadings to conform to the evidence and that appellants did not object or move for a continuance. It further found that appellants failed to allege or even demonstrate how they were prejudiced by this amendment. Kristy filed a supplemental notice of appeal on January 6, 2019, to include the court's December 31 order. Erik's supplemental notice of appeal was filed on January 7. This appeal followed.

Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof.[3] Dependency-neglect allegations must be proved by a preponderance of the evidence.[4] In dependency-neglect cases, the standard of review on appeal is de novo, but we do not reverse the circuit court's findings unless they are clearly

---

[3]Ark. Code Ann. § 9-27-327(a)(1)(A) (Supp. 2019).

[4]Ark. Code Ann. § 9-27-325(h)(2)(A)(ii).

erroneous or clearly against the preponderance of the evidence.[5] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[6] In reviewing a dependency-neglect adjudication, we defer to the circuit court's evaluation of the credibility of the witnesses.[7]

Arkansas Code Annotated section 9-27-303(18)(A) defines a "dependent-neglected juvenile" as any juvenile who is at substantial risk of serious harm as a result of abuse, neglect, parental unfitness, along with other acts or omissions. Abuse has been defined as intentionally or knowingly "[s]ubjecting a child to Munchausen syndrome by proxy, also known as factitious illness by proxy, when reported and confirmed by medical personnel or a medical facility."[8] The statute does not require that actual physical injury occur. Neglect is defined as the failure or refusal to provide the necessary food, clothing, shelter, or medical treatment necessary for the juvenile's well-being; as well as the failure to take reasonable action to protect the juvenile from abuse, neglect, or parental unfitness when the existence of this condition was known or should have been known.[9] There is no statutory definition for parental unfitness.

---

[5] *Ward v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 376, 553 S.W.3d 761.

[6] *Id.*

[7] *Id.*

[8] Ark. Code Ann. § 9-27-303(3)(A)(vii)(j).

[9] Ark. Code Ann. § 9-27-303(36)(A)(ii)–(iii).

Appellants' first point on appeal is actually several different points rolled into one. Appellants first challenge the definition of Munchausen syndrome by proxy as explained to the court by Dr. Farst. Dr. Farst explained that the term has evolved to include several instances of child abuse implemented directly or indirectly by the caregiver. She stated that as a pediatrician, her focus was on the abuse suffered by the child, not on the caregiver. Appellants' argument regarding Dr. Farst's testimony centers on the fact that she did not rely on the DSM[10] or any other psychological or psychiatric diagnosis in relation to Kristy. According to appellants, this is at odds with both the statute and definition accepted within the medical profession. Based on the statutory language found above, there is no requirement that Kristy has to be diagnosed with Munchausen syndrome by proxy before a child can be found to be dependent-neglected based on it. To the extent that appellants claim that Dr. Farst's diagnosis had to be in line with the DSM before a diagnosis could be made, there is no indication in the statute that DSM has been adopted as authority for this statute. As written, the statute requires only that the diagnosis be reported and confirmed by medical facility or medical personnel. Here, Dr. Farst met this requirement. Additionally, Dr. Meghan Repp stated that the literature now tells medical professional to recognize the implications of Munchausen syndrome by proxy from the child's perspective. She further stated that when she uses the terms, she "really means what is happening to the child, not what the psychological diagnosis is of the parent." Dr. Repp testified that words like "child medical abuse" and "pediatric condition falsification" are synonymous with Munchausen syndrome by proxy. She indicated that although she did not make the

[10]Diagnostic and Statistical Manual of Mental Disorders.

17

diagnosis in this case, she agrees with Dr. Farst's diagnosis. The court heard each side's position, including appellants' insistence that Munchausen syndrome by proxy had to be based on a diagnosis of Kristy. In the end, the court found that no such diagnosis is required. We cannot say that this finding is clearly erroneous.

Appellants also contend that Dr. Farst's testimony disregarded the statutory requirement that a child be intentionally or knowingly subjected to Munchausen syndrome by proxy. However, regardless of the standard Dr. Farst chose to use during her testimony, the court was presented with the statutory language and was aware of the requirement that in order for Kristy's actions to be considered abuse, they had to be intentional or knowing. Although the court did not specifically find that Kristy's actions of misrepresentations were intentional or knowing, in the absence of a showing to the contrary, this court must presume that a court acted properly and made the findings necessary to support its judgment.[11] Here, there was ample of testimony where the court could conclude that Kristy's actions of misrepresenting information to the medical professionals were done either intentionally, knowingly, or both.

Appellants ask this court to overturn *Parker v. Arkansas Department of Human Services*,[12] to the extent it stands for the proposition that Munchausen syndrome by proxy can be found despite the absence of a diagnosis of the caretaker. However, we decline this invitation. The statute has no such requirement and *Parker* is in line with the statute. Appellant argues

---

[11]*Pelayo v. Sims*, 2020 Ark. App. 258, 600 S.W.3d 114.

[12]2011 Ark. App. 18, 381 S.W.3d 471.

18

that a diagnosis of the caretaker is required by the DSM, but as stated earlier, there is no indication that the legislature intended for it to be the authority for this particular statute.

Appellants also contend that Dr. Farst's testimony and definition regarding Munchausen syndrome by proxy have constitutional ramifications. Appellants mentioned these constitutional challenges in their proposed findings of facts and conclusions of law, but the court never ruled on the issues. As a matter of fact, the adjudication order is silent on appellants' constitutional issues. It is well settled that to preserve arguments for appeal, even constitutional ones, the appellant must obtain a ruling below.[13] In their reply, appellants equate the court's grant of appellees' petition as overruling all of appellants' objections, including their constitutional ones. However, granting a petition and obtaining a ruling are not one in the same, and appellants have failed to cite this court to any legal authority which states otherwise.

We hold that the circuit court correctly found that L.S. was dependent-neglected as a result of abuse (Kristy subjecting him to Munchausen syndrome by proxy), neglect (by appellants due to their failure or refusal to provide the necessary nutrition and medical treatment to L.S.), and parental unfitness (a fit parent would not exaggerate or misrepresent symptoms to medical providers and a fit parent would not acquiesce to another caregiver's false reporting). Based on the evidence, the court correctly found that Erik played a role in L.S.'s dependency-neglect status. Therefore, we affirm the court's dependency-neglect findings as against both appellants.

---

[13]*Chacon v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 277, 600 S.W.3d 131.

19

Next, appellants argue that the circuit court's posthearing attempt to redefine the allegations violates rules of procedure, constitutional requirements, and the court's own pretrial guarantees. This argument has no merit. When DHS filed its affidavit, it alleged that L.S. was dependent-neglected due to abuse, neglect, and parental unfitness. The court granted DHS's petition based on abuse, neglect, and parental unfitness. In the order denying appellants' motion to vacate the adjudication order, the court indicated that the reasons for dependency-neglect did not change, but that the evidence adduced at the hearing elaborated more on what was initially pled. Although the court said that it granted DHS's request to amend the pleadings to reflect the evidence, no amendment was necessary because DHS had already stated its theory for dependency-neglect against appellants and stood on its petition and supporting affidavit.

To the extent that an amendment was necessary, the court was within its bounds to grant the amendment. Arkansas Rule of Civil Procedure 15(b) governs the amendment of pleadings to conform to the evidence and states that pleadings can be amended at any time, including after judgment. If a party objects to the amendment, the court may still allow the amendment in its discretion. The court may also grant a continuance to allow the objecting party to meet such evidence. Here, DHS moved to have the pleadings conform to the evidence after it concluded its case and Kristy moved for dismissal. Kristy objected to the amendment based on improper notice. The court did not rule on the pleadings until the adjudication order. The circuit court stated that it was using its discretion to allow the amendment, which it is permitted to do. Although a court may allow an objecting party a continuance, it is not required to do so. A circuit court's decision regarding the amendment

20

of pleadings to conform to the evidence will not be reversed absent a manifest abuse of discretion,[14] and the party seeking reversal on that ground must show the manifest abuse.[15] Prejudice from the circuit court's ruling must also be demonstrated.[16] Both appellants have failed to demonstrate how they would have presented their cases differently had they known that the court would allow DHS to amend its pleadings. Thus, we hold that there was no abuse of discretion in allowing the amendment.

In an earlier hearing, the court informed DHS that it had to notify appellants what theory it was basing its petition for dependency-neglect on. DHS stated that it was standing by its petition and supporting affidavit. The court in turn told DHS that it would be limited to what it had indicated to the attorneys it was going to prove. Here, as the court suggested in its December 31 order, the allegations against appellants did not change, those allegations were just elaborated upon during the hearing. Thus, there were no due-process violations as appellants were fully aware that DHS sought to have the court declare L.S. dependent-neglected as a result of abuse, neglect, and parental unfitness.

Finally, appellants argue that the court's findings of facts are clearly erroneous. It appears that appellants want this court to reweigh the evidence in their favor. Under our standard of review, we do not act as a super fact-finder, and it is not reversible error for the circuit court to weigh the evidence differently than how appellants ask the evidence to be

---

[14]*Ison Props., LLC v. Wood*, 85 Ark. App. 443, 156 S.W.3d 742 (2004).

[15]*Hickman v. Kralicek Realty & Constr. Co.*, 84 Ark. App. 61, 66, 129 S.W.3d 317, 320 (2003).

[16]*Honeycutt v. Honeycutt*, 2017 Ark. App. 113, 516 S.W.3d 750.

weighed.[17]  The circuit court's findings are supported by the record.  Accordingly, we affirm.

Affirmed.

ABRAMSON and SWITZER, JJ., agree.

*Jeff Rosenzweig*, for appellants.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor child.

---

[17]*Allen v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 136, 540 S.W.3d 742.